UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TEXAS INSURANCE COMPANY | * | CIVIL ACTION NO. 23-3412 |
| | * | |
| | * | SECTION: "O"(1) |
| VERSUS | * | |
| | * | JUDGE BRANDON S. LONG |
| TALISMAN SPECIALTY | * | |
| UNDERWRITERS, INC. | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************ | * | |

ORDER AND REASONS

This breach of contract, fraud, and detrimental reliance lawsuit and countersuit concerns an insurance policy fronting arrangement between Texas Insurance Company, Inc. ("TIC") and Talisman Specialty Underwriters, Inc. ("Talisman"). Before the Court is Talisman's Motion to Compel Compliant Privilege Log, for In Camera Review, and for Leave to Re-Depose Witnesses. Rec. Doc. 130. For the following reasons, the Motion is GRANTED in part and DENIED in part.

Background

The parties' relationship predates the April 2023 fronting agreement between them. On January 3, 2023, Talisman's affiliate Talisman Holding Company, Inc. entered into a Stock Purchase Agreement with North American Casualty Co. for the purchase of Catlin Specialty Insurance Company, Inc. ("Catlin"). North American is the parent company of both Catlin and TIC. And AU Holding Company, Inc. ("AU") is the ultimate parent of all three.

As part of this deal, Talisman entered into a Managing General Agent Agreement with Catlin (the "Catlin MGA Agreement"), pursuant to which Talisman would be allowed to issue insurance policies in Catlin's name on Catlin's paper. The Catlin MGA Agreement also provided that TIC would step into Catlin's place if Catlin failed to maintain an A.M. Best financial strength rating of at least A-.

1

Talisman discovered Catlin's AM Best rating was withdrawn on January 11, 2023, and, according to Talisman, the parties had a conference call during which TIC representatives stated that Talisman could immediately begin writing policies in TIC's name in the same lines that had been approved for Talisman to write in Catlin's name.

On February 10, 2023, TIC issued a letter of authority effective January 3, 2023, enumerating the lines of business that Talisman was authorized to write in TIC's name and allowing Talisman to sub-delegate. TIC claims that it learned sometime in February 2023 that Talisman was writing insurance on lines of business that had not first been vetted by TIC. On February 14, 2023, TIC sent a letter to Talisman's sub-delegee Rockstone and USI stating that Rockstone did not have authority as a sub-delegee of Talisman. But on February 17, 2023, TIC retracted the letter.

On February 23, 2023, TIC and Talisman representatives had a call regarding TIC's vetting and authorization requirements. And on March 6, 2023, the parties had a meeting along with principals from the parent companies, North American and AU. On April 1, 2023, Talisman and TIC entered into a Managing General Agent Agreement ("TIC MGA Agreement") authorizing Talisman to act as a managing general agent for TIC for the entry and underwriting of certain lines of insurance "as agreed." On the same date, TIC entered into a Quota Share Reinsurance Agreement with Talisman affiliate Talisman Insurance Company, Inc. pursuant to which Talisman Insurance agreed to reinsure the insurance written pursuant to the TIC MGA Agreement.

Sometime in April, TIC approved the NAFTA Trucking program line of insurance for Talisman to write. On April 12, 2023, Talisman submitted recreational marine policies for TIC approval. But TIC soon learned that Talisman was already writing marine and energy policies that TIC had not yet authorized. On June 15, 2023, TIC issued a Cease and Desist Letter to Talisman.

It also began sending letters to Talisman sub-delegees claiming that Talisman did not have authority to write business in TIC's name.

TIC filed the present lawsuit on August 14, 2023. Talisman filed counterclaims against TIC. Talisman Insurance intervened alleging that TIC had failed to pay the premiums due to it under the Quota Share Reinsurance Agreement. The trial in this matter has recently been continued and is now set to begin on May 26, 2026. The new deadline to complete discovery is March 18, 2026.

Presently before the Court is Talisman's Motion to Compel Compliant Privilege Log, for In-Camera Review, and for Leave to Re-Depose Witnesses. During a status conference on July 17, 2025, the undersigned ordered a sampling of 50 emails on the privilege log to be selected by Talisman and produced by TIC for in camera review. The undersigned required TIC to supplement its privilege log to provide details regarding the attachments, but did not require additional supplementation of the privilege log. TIC provided the selected documents for in camera review along with their attachments, supplemented its privilege log as ordered, and supplemented its privilege log to include entries for documents it had produced with the privileged portions redacted. TIC also produced two declarations of in-house counsel Jeffrey Silver, who provides further explanation of the documents along with his professional opinion that the documents are privileged.[1]

The privilege log presently before the Court lists 2368 entries. Of these, 1889 are attachments to emails. Of those attachments, 1495 have been produced by TIC elsewhere in its

---

[1] TIC provided these declarations along with its in camera productions and has labeled them "Submitted for in camera review." The court finds, however, that Talisman should be provided with a copy of these declarations. TIC may redact any portions of the declarations that would reveal the contents of the privileged communications. However, TIC should take care not to over-redact, as the Court finds that much of the content remains generic but would assist Talisman in understanding the basis for TIC's privilege assertions.

document production. The privilege log lists 479 emails. The description column of the privilege log has a total of seven different possible descriptions for the emails.[2] The separately produced redaction log contains an additional 371 entries. These are all emails. This log does not contain a "description" column.

The main issue here results from the fact that TIC's general counsel, the aforementioned Jeffrey Silver, was involved with the negotiation of the agreements at issue in this lawsuit, the interpretation of the obligations of the parties under those agreements, and the communications with A.M. Best regarding Catlin. TIC has claimed that many (perhaps all?) of Silver's internal communications are privileged. But Talisman argues that Silver also served in a non-legal business role for TIC and its affiliates and that, as a result, not all of his communications can be protected by the attorney-client privilege. TIC insists that Silver's role negotiating the relevant transactions was legal and that by Talisman's theory, it should be required to produce its communications with its outside counsel, who handled negotiation of the contracts for the Talisman side. An ancillary issue concerns the purported involvement of third parties in the communications.

Talisman also argues that TIC has waived the attorney-client privilege under the offensive use doctrine because it has put certain topics within Silver's knowledge at issue. It submits that key issues in this case concern (1) TIC's position that it did not know that Catlin's A.M. Best rating would be withdrawn in advance of the Catlin-Talisman transaction and (2) the dispute over TIC's knowledge/understanding of the scope of Talisman's authority to underwrite. Talisman argues that TIC has put Silver's internal communications reflecting TIC's knowledge at issue. TIC counters

---

[2] This column describes each email as either (1) "seeking, providing, or reflecting legal advice, or undertaken by or at the request of counsel," (2) "analysis undertaken at the request of counsel," or (3) "communications with outside counsel" and then identifies one of the following five (arguably four) topics: the instant dispute, the instant litigation, regulatory advice or approvals, the MGA, or the SPA.

that it has not put the privileged communications at issue, such as by relying on Silver's advice in support of its claims or defenses.

Finally, Talisman argues that TIC has waived the attorney-client privilege under the crime-fraud exception. TIC responds that Talisman has not come close to making the required prima facie showing that the communications were intended to further continuing or future criminal activity or fraud.

<u>Law and Analysis</u>

1. *Applicable Law*

    a. *Privilege*

This state law dispute is before the Court under its diversity jurisdiction and, therefore, state privilege law applies. <u>See</u> Fed. R. Evid. 501 ("[I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision therefore shall be determined in accordance with state law."); <u>Hyde Const. Co. v. Koehring Co.</u>, 455 F.2d 337, 340 (5th Cir. 1972). Talisman contends that Nebraska law should apply to the attorney-client privilege analysis because Texas Insurance's in-house counsel Jeffrey Silver resides in Nebraska and the principal place of business of Texas Insurance and its relevant affiliates AU and North American is in Nebraska.[3] As a result, it argues, Silver and the entities likely expected their home state's privilege to apply, the attorney-client relationship was formed in Nebraska, and Nebraska's interest in protecting its

---

[3] Using the choice of law rules of Louisiana where this court sits, <u>see</u> <u>Kozan v. Comstock</u>, 270 F.2d 839, 841 (5th Cir. 1959), the court must determine "the state whose policies would be most seriously impaired if its law were not applied to that issue" by "evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state." La. Civ. Code art. 3515.

residents' attorney-client communications would be most seriously impaired if Nebraska privilege

law was not applied. Texas Insurance does not dispute this argument. And the Court agrees that

the interests of Nebraska would be most seriously impaired if its law were not applied to the

attorney-client privilege issue now before the Court.

As in other states, under Nebraska law, "[a] client has a privilege to refuse to disclose and

to prevent any other person from disclosing confidential communications between the client and

his or her lawyer made for the purpose of facilitating the rendition of professional legal services

to the client." State ex rel. Stivrins v. Flowers, 729 N.W.2d 311, 316 (Neb. 2007). The United

States Supreme Court has recognized that the purpose of the attorney-client privilege:

> is to encourage full and frank communication between attorneys and their clients
> and thereby promote broader public interests in the observance of law and
> administration of justice. The privilege recognizes that sound legal advice or
> advocacy serves public ends and that such advice or advocacy depends upon the
> lawyer's being fully informed by the client.

Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). The party invoking the privilege bears the

burden of establishing that it applies. Greenwalt v. Wal-Mart Stores, Inc., 567 N.W.2d 560, 566

(Neb. 1997).

Determining whether the purpose of a communication with an attorney was to provide or

receive legal advice can be complicated when the communication involves in-house counsel

because these attorneys may serve in multiple roles (including non-legal).[4] Often, such documents

contain both legal and non-legal components. In this district, courts typically focus on

"whether counsel was participating in the communications primarily for the purpose of

---

[4] "[B]ecause in-house counsel has an increased level of participation in the day-to-day operations of the corporation,
it is more difficult to define the scope of the privilege when a communication is made to in-house counsel." Stoffels
v. SBC Commc'ns, Inc., 263 F.R.D. 406, 411 (W.D. Tex. 2009)).

rendering legal advice or assistance." In re Vioxx Prod. Liab. Litig., 501 F. Supp. 2d 789, 798 (E.D. La. 2007) (quoting Special Master's Report). Some cases from the District of Nebraska similarly find that where "the primary purpose of the communication is to discern the legal ramifications of a potential course of action, that communication is for a 'legal' purpose." Premiere Digital Access, Inc. v. Cent. Tel. Co., 360 F. Supp. 2d 1168, 1174 (D. Nev. 2005); see Infogroup Inc. v. Off. Depot, Inc., No. 8:20CV109, 2022 WL 11252434, at *2 (D. Neb. Oct. 19, 2022) ("[T]he party invoking the privilege must show the communication is for the purpose of securing *primarily* either (1) an opinion on law; or (2) legal services; or (3) assistance in some legal proceeding.") (emphasis added) (quoting Nat'l Sec. Couns. v. Cent. Intel. Agency, 206 F. Supp. 3d 241, 284 (D.D.C. 2016), aff'd, 969 F.3d 406 (D.C. Cir. 2020); Logsdon v. BNSF Ry. Co., No. 8:15CV232, 2016 WL 11969813, at *2 (D. Neb. Oct. 12, 2016); Kellogg v. Nike, Inc., No. 8:07CV70, 2007 WL 4570871, at *6 (D. Neb. Dec. 26, 2007). But this court has found no example of a state court in Nebraska analyzing the "primary" purpose of the communication. Instead, Nebraska courts consider whether there is an attorney-client relationship and whether the communication was confidential. Stivrins, 729 N.W.2d at 316. "An attorney-client relationship is created when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance." Id. at 317

Courts have held that contract negotiations fall within an attorney's professional competence for purposes of the attorney client privilege. Exxon Mobil Corp. v. Hill, 751 F.3d 379, 382 (5th Cir. 2014) (finding that plaintiff "was approaching its in-house counsel for just the sort of lawyerly thing one would expect of an in-house lawyer: advice on transactional matters."); Fed. Deposit Ins. Corp. v. Bryan, No. 1:11-CV-2790-JEC-GGB, 2012 WL 12835873, at *4 (N.D. Ga.

Nov. 28, 2012), aff'd, No. 1:11-CV-2790-JEC, 2014 WL 11517836 (N.D. Ga. Feb. 14, 2014) ("Insurance policies are contracts, and legal advice often includes advice on the negotiation and interpretation of contracts."); Boss Mfg. Co. v. Hugo Boss AG, No. 97 CIV. 8495 SHS MHD, 1999 WL 47324, at *2 (S.D.N.Y. Feb. 1, 1999) ("[C]ounsel's direct involvement in the negotiations is entirely consistent with the traditional role of the attorney as a legal adviser and legal representative of the client."); Diversey U.S. Holdings, Inc. v. Sara Lee Corp., No. 91 C 6234, 1994 WL 71462, at *1 (N.D. Ill. Mar. 3, 1994) ("This strikes us as the gathering of information by an attorney from the client to enable the attorney to provide competent legal services—in this case, the drafting of a contract."). But some courts do require the communications to reflect some level of legal advice. E.g., R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc., No. 99 C 1174, 2001 WL 1286727, at *5 (N.D. Ill. Oct. 24, 2001) ("Communications by a client to a lawyer for advice on the *legal implications* of proposed contract terms are protected, as well as the advice that the lawyer gives regarding those terms.") (emphasis added); TVT Recs., Inc. v. Island Def Jam Music Grp., a Div. of UMG Recordings, Inc., No. 02 CIV. 6644 (VMDF), 2003 WL 749801, at *2 (S.D.N.Y. Mar. 5, 2003) (finding that communications with counsel related to the negotiation of business deals were generally protected where they were "strategy discussions with counsel" but not where the documents did not reflect attorney strategy such as "an attorney . . . merely conveying to his client the substance of what a third party has conveyed"); see Le v. Zuffa, LLC, No. 215CV01045RFBPAL, 2017 WL 600083, at *3 (D. Nev. Feb. 13, 2017) (holding that only portions of a memorandum that "read in context, contain [counsel's] legal analysis of existing contract terms and the legal consequences of agreeing or disagreeing with what the [other side's] counsel was proposing" were entitled to protection).

### b.  *Privilege Logs*

When documents are withheld as privileged or protected as trial-preparation materials, Federal Rule of Civil Procedure 26(b)(5)(A) requires that the party invoking the privilege "(i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Courts typically require a privilege log that identifies "each document and provide[s] basic information, including the author, recipient, date and general nature of the document." <u>Benson v. Rosenthal</u>, No. CV 15-782, 2016 WL 1046126, at *9 (E.D. La. Mar. 16, 2016) (quoting <u>In re Papst Licensing, GmbH Patent Litig.</u>, No. Civ. A. MDL 1298, 2001 WL 1135268, at *2 (E.D. La. Sept. 19, 2001)). But "simply describing a lawyer's advice as 'legal,' without more, is conclusory and insufficient to carry out the proponent's burden of establishing attorney-client privilege." <u>Equal Emp. Opportunity Comm'n v. BDO USA, L.L.P.</u>, 876 F.3d 690, 696 (5th Cir. 2017).

### c.  *"Placing-at-Issue" Waiver*

Nebraska recognizes waiver of the attorney-client privilege where "the party asserting the privilege placed information protected by it in issue through some affirmative act for his own benefit." <u>League v. Vanice</u>, 374 N.W.2d 849, 856 (Neb. 1985). To determine if this principle applies, the court should consider whether "(1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense." <u>Id.</u>  (quoting <u>Connell v. Bernstein-Macaulay, Inc.</u>, 407 F. Supp. 420, 423 (S.D.N.Y. 1976)).

In <u>League</u>, the plaintiff sought to avoid application of the statute of limitations by alleging that the defendant had concealed "the questioned events or transactions," which the court found injected plaintiff's "knowledge, or lack of knowledge, into the litigation as a crucial issue relevant to disposition of the claims based on an alleged breach of fiduciary duty by defendant." <u>Id.</u> at 856. The Nebraska Supreme Court held that the plaintiff had waived the attorney-client privilege "concerning those communications bearing upon [plaintiff's] knowledge of events or transactions relevant to his claims against [defendant]." <u>Id.</u>; <u>see</u> <u>Unland v. City of Lincoln</u>, 530 N.W.2d 624, 629 (Neb. 1995) ("[A] litigant is not permitted to thrust his lack of knowledge into litigation as a foundation or condition necessary to sustain a claim against another while simultaneously retaining the attorney-client privilege to frustrate proof of knowledge negating the very foundation or condition necessary to prevail on the claim asserted."). Thus, the court held that the trial court had not erred in allowing testimony of plaintiff's attorney that he had informed plaintiff about the transactions in question at the time they occurred and that plaintiff had at that time considered but declined to file suit against the defendant. <u>League</u>, 374 N.W.2d at 852, 856-57. Similarly, in <u>Unland</u>, the Nebraska Supreme Court held that the plaintiff had waived the attorney-client privilege over communications with his counsel regarding the charges against him where plaintiff claimed his due process rights had been violated because he had not been notified of the charges against him and where there was evidence that defendant had discussed the charges against plaintiff with plaintiff's counsel. 530 N.W.2d at 841, 844.

The Nebraska Supreme Court has also recognized placing-at-issue waiver in a situation that might be more familiar to Louisiana practitioners.[5] In <u>State v. Roeder</u>, the Nebraska Supreme

---

[5] Citing <u>League</u>, the Louisiana Supreme Court has rejected the three part test "because it improperly undermines the legislatively established attorney-client privilege by causing courts to reassess the privilege by weighing the individual privilege-holder's interests against his opponent's need for evidence whenever the privilege is attacked." <u>Smith v. Kavanaugh, Pierson & Talley</u>, 513 So. 2d 1138, 1145 (La. 1987).

Court held that a defendant had waived the attorney-client privilege by seeking to withdraw her guilty plea on the basis that she felt she was coerced into the plea and by claiming that her counsel had told her that if she did not plead guilty she would be held with no bond until trial. 636 N.W.2d 870, 876–77 (Neb. 2001).

###### d. Crime-Fraud Exception

The parties submit that there is no difference in the crime-fraud exception under Nebraska, Louisiana, Oklahoma, or New York Law. "Under the crime-fraud exception to the attorney-client privilege, the privilege can be overcome where communication or work product is intended to further continuing or future criminal or fraudulent activity." In re Grand Jury Subpoenas, 561 F.3d 408, 412 (5th Cir. 2009) (quoting In re Grand Jury Subpoena, 419 F.3d 329, 335 (5th Cir. 2005)). But "[m]ere allegations of fraud are not, however, sufficient to break the privilege." Ward v. Succession of Freeman, 854 F.2d 780, 790 (5th Cir. 1988). "The party challenging the privilege must (1) make an independent prima facie case that a crime has been committed, and (2) then demonstrate that the privileged information bears a relationship to the alleged crime or fraud." Id.

##### 2. Analysis

###### a. Adequacy of TIC's Privilege Log

Talisman contends that TIC's privilege log is insufficient because it contains nearly identical descriptions of the logged documents.[6] It adds that TIC has made no attempt to address Silver's dual role as an attorney and a business advisor. TIC contends that its privilege log is more than sufficient because it includes the name of the custodian, the date and time of the document or

---

[6] As discussed in the background section, Talisman also challenged TIC's failure to provide details regarding the attachments. In compliance with the Court's order, TIC has remedied this deficiency and this issue is now moot.

communication, the category of the record, the subject of the email, the sender and recipients, the basis for privilege, and a description of the basis of the privilege.

The Court finds that TIC has provided a thorough amount of meta data regarding the listed documents. It has also appropriately identified the topic/subject matter of the communication. The descriptions specifically identify communications undertaken at the request of counsel for purposes of facilitating legal advice. But its descriptions remain somewhat generic in failing to distinguish between a request by the client for legal advice, the providing by counsel of legal advice, or a request by counsel for information to assist in the providing of legal advice. Nonetheless, the Court finds this is not fatal here because the reader can determine based on the sender of the email whether it was generated by the lawyer or the client. The Court finds that in this case, any further description on the privilege log would likely result in disclosure of the privileged communication itself (e.g., the precise legal advice provided to show that Silver's involvement reflected a legal as opposed to business purpose). Further supplementation of the privilege log will not be required.

b.  *Involvement of Third Parties*

In its Motion, Talisman identified three individuals that appeared to be non-TIC parties that would destroy the confidentiality of any privileged communications. In opposition, TIC explains that Tony Usher and Tim Adair are associated with Concept Specialty Risks, which is an AU affiliate. They are also managing directors of AU. As such, Silver also provided legal advice to Usher and Adair, as he does with other members of AU affiliates. TIC explains that Gerard Altonji is a consultant that TIC retained to provide services in connection with submissions to A.M. Best. It says that communications with Altonji were undertaken to facilitate legal advice provided by Mr. Silver to AU, North American, and TIC.

In two footnotes, TIC addresses two other invididuals with non-AU email addresses. It says that Richard Christofer is a managing director of AU and also serves as President and Chief Commercial Officer of United Risk, formerly owned by AU, to which Mr. Silver also provides legal services. It also cites communications with Armanino LLP, an accounting firm retained by AU to provide accounting services to AU and its affiliates. TIC says that Mr. Silver engaged in confidential communications with Armanino as part of his provision of legal advice to AU, North American, and Texas Insurance.

Talisman does not address any of these assertions in reply.

The Court finds that TIC has sufficiently established that Usher, Adair, and Christofer are within the umbrella of the client AU to which Mr. Silver may have provided legal advice. See Am. Airlines, Inc. v. Travelport Ltd., No. 4:11-CV-244-Y, 2012 WL 12884822, at *5 (N.D. Tex. July 16, 2012) ("[D]isclosure of communications between a parent and its majority-owned subsidiaries does not result in waiver of the attorney-client privilege."); see also Zapato Gulf Marine Corp. v. Puerto Rico Mar. Shipping Auth., No. CIV. A. 86-2911, 1989 WL 149227, at *2 (E.D. La. Dec. 5, 1989).

With regard to the accounting firm, while there is no "account-client communications privilege," United States v. El Paso Co., 682 F.2d 530, 540 (5th Cir. 1982), courts have held that "[a]ccounting services performed ancillary to legal advice may be within the attorney-client privilege." United States v. Davis, 636 F.2d 1028, 1044 n. 17 (5th Cir. 1981). Communications with Armanino meeting this standard will be privileged.

As to consultants like Altonji, courts "have found that the attorney-client privilege can extend to communications between the attorney and an independent contractor of the client." Burroughs Diesel, Inc. v. Baker Petrolite, LLC, No. 2:18-CV-26-KS-MTP, 2018 WL 6517454, at

*5 n. 3 (S.D. Miss. Dec. 11, 2018) (citing cases). Courts recognizing such an extension typically ask whether the third party was the functional equivalent of an employee. See LG Elecs. U.S.A., Inc. v. Whirlpool Corp., 661 F. Supp. 2d 958, 961 (N.D. Ill. 2009). For example, the Southern District of New York considers "whether the consultant had primary responsibility for a key corporate job, whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in litigation, and whether the consultant is likely to possess information possessed by no one else at the company." Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co., 232 F.R.D. 103, 113 (S.D.N.Y. 2005). Whether communications with Altonji satisfy these and the other requirements of the attorney-client privilege must be considered on a document by document basis.

   c.  *Documents Produced for In Camera Review*

   The following documents (identified by the Reference ID assigned by Talisman in selecting them rather than their Bates number) are privileged because, to varying degrees, they involve the request for legal advice, the providing of legal advice, the sharing among employees of Silver's advice, or the collection of information for the purpose of legal advice all concerning drafting or interpretation of contracts, which the Court finds are within Silver's professional competence as an attorney here: 3, 19 (redacted), 20,  21, 22, 23(redacted), 25 (redacted) 26, 27, 30, 31, 32, 33, 34, 35, 37, 38 (redacted), 39 (redacted), 40, 42, 43 (redacted), 44, 45 (redacted), 46 (redacted), 50 (redacted).

   The following communications are similarly privileged because they concern contract negotiation, status, or strategy, which the Court finds are within Silver's professional competence as an attorney here: 6, 8, 9, 10, 48 (redacted).

The following communication is privileged because it concerns a request for legal advice and the providing of legal advice: 49 (redacted).

The also Court finds the following communications concerning discussions and interactions with A.M. Best are privileged: 7, 11, 12, 13, 14, 15, 16, 17 (redacted), 18 (redacted), 47. These communications reveal that Mr. Silver was acting in his role as attorney, sometimes communicating his interactions with A.M. Best to his clients and sometimes working with consultant Altonji regarding his interactions with A.M. Best and attempts to obtain necessary information. In some cases, these communications concern litigation related issues. Even when litigation is not discussed, the Court finds that unlike the mere filing-related communication discussed below, the cited communications reflect strategic discussions. Further, as represented by Silver in his declaration, these communications relate to the sale of Catlin, a transaction that Silver was negotiating and ultimately drafting in his capacity as a legal advisor.

The court finds, however, that TIC has not established that document 1 is privileged. Silver's communications with an outside party concerning regulatory filings may satisfy a legal obligation of the company, but the communication does not reflect or suggest a request for legal advice, the providing of legal advice, or the collection of information for the purpose of providing legal advice. TIC has not established the attorney-client privilege protects this document.

The following communications are not privileged because they merely forward documents with no indication that legal advice was being requested or provided and, as to emails sent to Mr. Silver, include non-attorney recipients as well: 4, 5, 24, 25 (redacted), 41 (redacted).

The following communications are not privileged because they merely request a meeting without any indication that legal advice is being requested: 28, 29, 36.

15

Similarly, document 2 merely requests a meeting without any indication that legal advice is being requested. The email includes an attachment which reflects the topics that may be discussed at the meeting. [7] However, the items listed in this document are business related, except for the items at 8.a and 8.c, which may be considered legal. Importantly, three of the four participants in the meeting are not legal personnel but businesspeople with the companies. The court finds the attachment is not privileged, except that items 8.a and 8.c may be redacted.

All emails found to be non-privileged must be produced, along with their attachments (subject to the redaction noted above), within 14 days. Additionally within those 14 days, TIC must reassess its privileged documents to determine if any documents previously identified as privileged should, in light of the Court's findings, be produced. After the 14 days, Talisman may, within a further 14 days, raise a challenge to any privilege log documents that it believes should be produced and the parties should meet and confer to discuss them. If the parties reach an impasse, they may contact the chambers of the undersigned to request a status conference.

### d. "Placing-At-Issue" Waiver

Talisman contends that TIC has waived the attorney-client privilege as to two categories of information: (1) TIC's knowledge of the withdrawal of Catlin's A.M. Best rating and (2) what TIC "knew before the sale, what authority was contemplated before the sale, and what authority was contemplated after the sale." The Court finds that TIC has not placed privileged communications "at issue" under Nebraska law. See League, 374 N.W.2d at 856 (providing that courts should consider whether "(1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put

---

[7] According to the declaration of Mr. Silver, the list was prepared by a consultant to the companies. Although the relationship between the companies and the consultant is not entirely clear from the declaration and in light of the information to be discussed at the meeting, the Court accepts at this time that the consultant could serve as an employee of the company for the purpose of the attorney-client privilege.

the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense").

As to TIC's knowledge of the withdrawal of Catlin's A.M. Best rating, the Court finds TIC has not placed any privileged communications with Silver at issue. Talisman cites Silver's testimony that he notified A.M. Best months before January 2023 that Catlin would no longer be a risk-bearing entity. Importantly, there is no indication that TIC claims Silver did not do so or that Silver did not have authority to speak on TIC's behalf.[8] As a result, the Court finds that there is no issue as to what Silver (and thereby TIC) told A.M. Best at all. Even if there is a dispute as to what exactly Silver told A.M. Best, the Court cannot now find that Silver's communications with TIC would shed any light on that question.

Talisman also argues that Silver/TIC knew that if Catlin was no longer a risk-bearing entity, A.M. Best would withdraw Catlin's rating. It seems to argue that, as a result, TIC's "knowledge" is at issue. But this is not the same kind of "knowledge" at issue in League where knowledge of a fact (defendant entering into a transaction[9]), not a legal interpretation, was at issue. Instead, here, Talisman may question TIC's *understanding* of the consequence of not being a risk-bearing entity. To the extent TIC claims that it did not understand/believe/know that Catlin's rating would be withdrawn when it ceased to be risk-bearing,[10] TIC's understanding is at issue in this lawsuit. This puts TIC's understanding of the consequences at issue, but not necessarily Silver's advice regarding the consequences. Importantly, there is no indication that TIC relies on Silver's advice,

---

[8] If that were the case, the Court might reconsider the argument that communications between TIC and Silver regarding his interactions with A.M. Best have been placed at issue for purposes of waiver under Nebraska law.

[9] As discussed above, in League, the plaintiff claimed he had no knowledge of certain transactions until years afterward, which impacted the running of the statute of limitations. Id. at 856-57. But plaintiff's counsel testified that he had informed the plaintiff about the transactions and they had even discussed the possibility of filing suit. Id. 852. This showed that plaintiff had notice that defendant had entered into the transactions.

[10] The parties have not highlighted TIC's position on this particular point, but the Court assumes for the purposes of this ruling that the parties dispute whether TIC reported to A.M. Best that Catlin would cease to be risk bearing knowing that this would result in Catlin's rating being withdrawn.

for example by claiming that Silver told it that there would be no change to Catlin's rating if they informed A.M. Best that Catlin would cease to be risk-bearing. Even if Silver's advice about the consequences (if any) could be considered relevant to determining *TIC*'s understanding, and therefore, in some sense, "at issue," Talisman has not shown the information is vital. Talisman could discover TIC's understanding via the non-privileged communications and testimony of the non-attorney Talisman employees. On the present record, the Court finds TIC has not placed any communications with Silver regarding his communications with A.M. Best or regarding the consequences of informing A.M. Best that Catlin would cease to be risk bearing at issue for purposes of waiver of the attorney client privilege under Nebraska law.

As to TIC's knowledge about the scope of Talisman's authority, the Court similarly finds no basis for waiver. Nebraska's principle of placing-at-issue waiver applies where the party's knowledge has been placed at issue, such as the knowledge of an act that would amount to notice under the statute of limitations, League, 374 N.W.2d at 856-57, or the knowledge of the charges against the party for purposes of determining whether the party had notice of the charges against him, Unland, 530 N.W.2d at 841, 844. Nebraska has also applied the principle where a criminal defendant argued her guilty plea should be withdrawn because she was coerced via statements conveyed to her by counsel. Roeder, 636 N.W.2d 876-77.

What Talisman proposes here goes much farther. It seems to claim that simply because Talisman and TIC disputed the scope of authority TIC had granted to Talisman by contract, TIC has waived the attorney-client privilege over advice its counsel may have provided with regard to the scope of the contract. If waiver applied automatically in such a situation, it would completely obliterate the attorney-client privilege. Importantly, there is no indication that the privileged communications themselves have been placed at issue, such as by TIC claiming that it was acting

on the advice of counsel as in <u>Roeder</u>. Nor is there any indication that TIC's "knowledge" is at issue as in <u>Unland</u> or <u>League</u>. Unlike in those cases, TIC's understanding of the scope of authority delegated to Talisman at any particular time is not a matter of TIC's "knowledge" for purposes of determining "notice" as to a claim or defense TIC has raised. The Court finds no basis to extend Nebraska's placing-at-issue waiver principle to TIC's communications with Silver regarding the scope of Talisman's authority under its agreement(s) with TIC simply because the scope of authority is at issue. To do so would mean that an attorney's advice regarding a disputed contract provision could never be privileged under Nebraska law—TIC has not provided any case law to support such a holding.

   *e.  Crime-Fraud Exception*

   Talisman argues that the crime fraud exception applies because Silver admitted that he told A.M. Best that Catlin would cease to be risk bearing, knowing that this would trigger the rating withdrawal, while selling Catlin to a buyer that TIC knew needed that rating. Yet, it points out, Silver admitted this was not disclosed to Talisman prior to closing. Talisman also cites to Silver's testimony that Talisman could "write your business" as long as it did not "go writing any nuclear reactors or anything like that." It argues that TIC now claims these authorizations were not given. It argues that the crime fraud exception applies.

   TIC argues that Talisman has fallen short of establishing a prima facie case of fraud. It argues that the cited testimony does not show fraud let alone that any privileged communications were undertaken in furtherance of any fraud.

   As to the statements to A.M. Best, Talisman has not presented any evidence indicating that TIC knew or understood that its statements would result in a withdrawal of the rating such that it might have fraudulently withheld this information from Talisman. Even if this could amount to

19

fraud, Talisman has not demonstrated that the privileged communications implicate such fraud. Indeed, having reviewed several A.M. Best related communications in camera, the Court finds no evidence therein that TIC sought legal advice from Silver to further a fraud on Talisman regarding the consequences of TIC's statements to A.M. Best.

As to Silver's testimony regarding his statements about Talisman's authority to write insurance, the Court finds Talisman has failed to make out a prima facie case of fraud. The fact that Talisman believes Silver's early statements are inconsistent with TIC's later position regarding Talisman's authority does not establish fraud.

The crime-fraud exception does not apply.

3. *Regarding Depositions*

The parties seem to agree that any ruling regarding whether depositions should be reopened is premature as no depositions have yet been taken. The Court agrees. To the extent any production of documents subject to the orders herein occurs after a deposition of a witness that could provide relevant testimony regarding such document(s), it may be appropriate to reopen the deposition for the limited purpose of questioning regarding such document(s) only. The parties should make a good faith attempt to resolve any such issues without Court involvement, but may request a status conference if they reach an impasse.

<u>Conclusion</u>

For the foregoing reasons, the Motion to Compel (Rec. Doc. 130) is GRANTED in part and DENIED in part. Within 14 days, TIC shall produce documents 1, 2 (subject to redaction as discussed above), 4, 5, 24, 25, 28, 29, 36, and 41, and shall review its privileged documents to determine if any others should, for similar reasons, be produced as not privileged. Within 14 days thereafter, Talisman may identify any privilege log entries it believes should be reassessed by TIC

20

in light of this Court's rulings. The parties shall meet and confer regarding those documents. The request to re-depose witnesses is denied without prejudice as premature.

IT IS FURTHER ORDERED that within 14 days, TIC shall produce to Talisman the Silver declarations, subject to appropriate redactions of privileged information. See supra note 1.

New Orleans, Louisiana, this 27th day of August, 2025.

Janis van Meerveld
United States Magistrate Judge